Filed 3/18/25  P. v. Domingo CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. SULIETO GUITCHE DOMINGO, Defendant and Appellant. | B336527 (Los Angeles County Super. Ct. No. NA105356) |

APPEAL from an order of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge.  Affirmed.

Jason Szydlik, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Steven D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

Defendant Sulieto Guitche Domingo appeals from the trial court's order denying his motion to vacate his sentence pursuant to Penal Code section 1473.7.[1]  We affirm.

# II.    BACKGROUND

## A.    *Defendant's Conviction*

On May 3, 2017, the District Attorney of Los Angeles County filed an information charging defendant with shooting at an occupied motor vehicle (§ 246; count 1) and two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 2 and 3).  As to count 1, the information alleged a principal personally used and personally and intentionally discharged a firearm causing great bodily injury and death (§ 12022.53, subds. (b)–(d) & (e)(1)) and the offense was committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(4)).  As to counts 2 and 3, the information alleged the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)).  The information further alleged defendant personally used a firearm.  (§ 12022.5.)

On August 13, 2018, facing a life term if convicted as charged, defendant, pursuant to a negotiated plea, pleaded no

---

[1]    All further statutory references are to the Penal Code.

contest to count 2 and admitted the accompanying gang allegation.[2]  The trial court dismissed counts 1 and 3 and sentenced defendant to 11 years in state prison.

Prior to taking defendant's plea, the trial court asked defendant if he needed time to speak with his attorney. Defendant asked to speak with his attorney "for a second."  After defendant spoke with his attorney, the court explained to defendant that the prosecutor was going to take his plea.  If defendant did not understand anything or if he changed his mind and did not want to "take this deal," he was to say "stop" and the court would give him the opportunity to speak with his attorney. Defendant acknowledged the court's advisement.

In taking defendant's plea, the prosecutor asked defendant if he had enough time to discuss the charges, any possible defenses, and his constitutional rights with his attorney. Defendant responded, "Yes."

The prosecutor explained to defendant, "As part of your plea, there will be certain consequences of your plea. . . .  [¶]  . . . [¶]  If you are not a citizen of the United States, because of your plea today you will be deported, excluded from admission to the United States, and denied naturalization."

The prosecutor asked if defendant had time to speak with his attorney about the immigration consequences of his plea. Defendant responded, "No, ma'am."   The plea was paused, and defendant spoke with his attorney.  The prosecutor then asked again if defendant had time to speak with his attorney about the immigration consequences.  Defendant replied, "Yes, ma'am." The prosecutor asked, "Has he told you anything differently than

---

[2]     The gang allegation was amended to section 186.22, subdivision (b)(1)(B).

3

what I have said on the record just now?" Defendant responded, "No."

Shortly thereafter, the prosecutor again asked defendant if he understood "all of the possible consequences of [his] plea." Defendant said he did. The prosecutor asked, "Are you pleading freely and voluntarily because this is what you would like to do?" Defendant said, "Yes, ma'am."

After the prosecutor took defendant's plea, the trial court said to defendant's counsel, "[Y]ou have had some conversations during the course of the plea. I just want to double-check, have you had a chance to talk to your client and determine either that he is a U.S. citizen or discuss any immigration consequences with him?" Defense counsel responded, "Yes, I discussed it with him."

B.    *Motion to Vacate*

On September 19, 2023, defendant filed a motion to vacate his conviction pursuant to sections 1016.5[3] and 1473.7.

1.    Defendant's Declaration

In support of his motion, defendant submitted his declaration. Defendant declared he was 30 years old when he entered his no contest plea. His goal in taking the plea was to minimize his time in custody. He did not speak with anyone about his immigration status prior to entering his plea. He first spoke about his immigration status when the trial court

---

[3]    At the subsequent hearing on defendant's motion, defense counsel stated defendant was not proceeding under section 1016.5.

4

interrupted his plea to allow him to discuss his immigration status with defense counsel. Defense counsel did not tell him the immigration consequences were mandatory, permanent, and unavoidable. Defendant "did not know there were any immigration consequences from [his] plea that would actually affect [him] personally."

Defendant was born in the Philippines. In 2002, when he was 14 years old, defendant entered the United States legally on an H-4 visa. He came to the United States with his sister to join their parents. He had been in the United States legally for 16 years. Consequently, he did not believe the immigration warnings applied to him. When he entered his plea, he trusted his attorney completely and understood his attorney negotiated in his best interest for getting him back to work to help support his family.

Prior to the day defendant entered his plea, the prosecution's offer was 13 years in state prison. Defendant rejected that offer and instructed his attorney to prepare for trial. Just prior to trial, defense counsel advised defendant that the prosecution had given him a "'last and final'" offer of 11 years with the condition that he would serve not more than half that time. Defense counsel strongly urged defendant to take the offer. Defense counsel did not discuss the immigration consequences with defendant. Defendant agreed to follow his counsel's advice and accept the new deal.

When the prosecutor took defendant's plea and advised defendant of the immigration consequences, the trial court asked him if he needed time to discuss the immigration consequences with his attorney. During a brief break that followed, defense counsel "told [defendant] nothing more and nothing different

5

than what the [prosecutor] read in the script." Defense counsel reiterated his strong recommendation that he take the plea. Defendant trusted and followed defense counsel's advice. "This was a mistake of profound consequences that [defendant] was unaware."

Defendant would not have accepted a plea if he knew it would permanently bar him from becoming a United States citizen. He did not know the consequences were mandatory and unavoidable. If he had known, he would have asked defense counsel to "seek an alternative resolution, such as to conspiracy that avoided such consequences, even if it required [him] to serve significant time in custody, or prepare for trial on [his] case."

Defendant believed the prosecutor's "'immigration warning script'" was given to every defendant regardless of citizenship status because he had heard the same warning given to other defendants before him, many of whom appeared to be "obvious U.S. citizens." Because he had been granted an H-4 visa, he did not believe the immigration warning applied to him.

Both of defendant's parents were in the United States and held green cards. His sister was a United States citizen. Defendant graduated from high school in the United States, attended El Camino College, and earned two degrees from Norco College. He worked and made many friends in this country. By 2018, he had never once returned to the Philippines—he did not know anyone there. He never would have agreed to a plea that "would have torn [him] from [his] parents and [his] sister and sent [him] to a country where [he] knew no one! That would be crazy!" At the time of his plea, he considered himself an American and not a Filipino because he had been in the United States for so long.

### 2. Plea Counsel's Testimony

On December 8, 2023, the trial court—the same court that had presided over defendant's plea—held a hearing on defendant's motion to vacate his sentence. Michael Duggan, defendant's counsel at his 2018 plea hearing, testified that as part of his standard practice in preparing criminal cases he discussed with his clients potential immigration consequences from accepting plea offers. Asked if he remembered speaking with defendant about potential immigration issues, Duggan responded, "Yes. We talked about it, I believe, numerous times." They had many discussions about immigration—it was "actually a big issue."

Specifically, Duggan advised defendant that he would be deported if he pleaded to a charge of violating section 245, subdivision (b)—the charge to which he pleaded—and if he went to prison. He would have told him he was definitely going to be deported. Duggan also advised defendant to speak with an immigration attorney, but he did not know if defendant followed his advice. When a pause was taken during defendant's plea so he could speak with defendant about the immigration consequences of the plea, Duggan talked to defendant "briefly" and "reminded him of what [they] had spoken about previously, and that was it."

### 3. Defendant's Testimony

Defendant testified that Duggan discussed immigration consequences with him prior to the day he entered his plea. Defendant was born in the Philippines and came to the United

7

States legally in 2002.  He attended high school and college here. He had never returned to the Philippines.  He had no reason to return to the Philippines—his parents, sister, wife, and child lived in the United States.  He planned to live in the United States for the rest of his life.

Duggan told him he would be deported, but Duggan never told him to consult with an immigration attorney.  When Duggan spoke with him about the immigration consequences during the pause in his plea, Duggan "just mentioned that is the best that I could get and I should take the deal."  Defendant assumed it was the best deal he could get, so he trusted Duggan and took the deal.  Asked if that was "with an understanding that it may avoid the immigration consequences because it's the best," defendant responded, "Yes, sir."

Defendant did not know if the immigration consequences were permanent.  He did not think they were mandatory because Duggan "never mentioned anything about immigration consequences."  He did not believe the immigration consequences were permanent for him because he came here legally.

Asked what he understood when the prosecutor advised that he would be deported as a consequence of his plea, defendant responded, "I thought that taking a plea deal has the same immigration consequences like I wouldn't be deported."  Pressed for a further explanation, defendant said, "During that time, I was just like nervous and there was a lot of things on my mind.  I just took the recommendation of my lawyer to take the plea."

During his nearly year-long representation of defendant, Duggan never mentioned anything about immigration to defendant.  Duggan was "too focused" on the criminal case that was supposed to go to trial.  Duggan never asked defendant about

his citizenship status, and defendant never raised it. Defendant disagreed with Duggan's testimony that they had conversations about defendant's immigration status.

During his plea, when the prosecutor told defendant he would be deported and asked if defendant had spoken with Duggan about immigration consequences, defendant wanted to speak with Duggan because he knew those consequences would affect him because he was not a citizen.

### 4. Trial Court's Ruling

Following the submission of evidence and argument, the trial court denied defendant's motion to vacate his sentence. It discounted defendant's declaration, finding it was clear defendant had not written it. The court credited Duggan's testimony—"[he] was pretty clear on the stand. He told him he was going to be deported."

The trial court found that any charge defendant was going to face would have immigration consequences. It believed Duggan obtained the best offer possible for defendant. Now that defendant was out of state prison and facing deportation, he wanted to retract the plea. The court did not credit defendant's contention that "he had no idea that he was going to be deported." Instead, it stated, "I firmly believe when I took this plea from you, you were told that you will be deported and you talked to your lawyer about that."

9

## III.  DISCUSSION

A.  *Legal Principles*

Section 1473.7, subdivision (a)(1) provides:  "A person who is no longer in criminal custody may file a motion to vacate a conviction or sentence" if "[t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence.  A finding of legal invalidity may, but need not, include a finding of ineffective assistance of counsel."

To prevail under section 1473.7, "[t]he defendant must first show that he did not meaningfully understand the immigration consequences of his plea.  Next, the defendant must show that his misunderstanding constituted prejudicial error.  '[P]rejudicial error . . . means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences.'  ([*People v.*] *Vivar* [(2021)] 11 Cal.5th [510], 529 [(*Vivar*)].)"  (*People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*).)  "A successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a *prejudicial* error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea.  (*Id.*, subds. (a)(1), (e)(1).)"  (*Vivar, supra*, 11 Cal.5th at p. 517.)

We independently review whether a defendant has shown he did not meaningfully understand the immigration consequences of his plea.  (*People v. Carrillo* (2024) 101

Cal.App.5th 1, 14.) "'[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' [Citation.] When courts engage in independent review, they should be mindful that "'[i]ndependent review is *not* the equivalent of de novo review . . . .'" [Citation.] An appellate court may not simply second-guess factual findings that are based on the trial court's own observations. [Citations.] . . . [F]actual determinations that are based on "'the credibility of witnesses the [superior court] heard and observed'" are entitled to particular deference, even though courts reviewing such claims generally may "'reach a different conclusion [from the trial court] on an independent examination of the evidence . . . even where the evidence is conflicting.'" (*Vivar, supra*, 11 Cal.5th at p. 527.) "'[T]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding." (*Id.* at p. 528.)

B.      *Analysis*

Defendant contends he met his burden to show he did not meaningfully understand the immigration consequences of his plea. We disagree.

When defendant's plea was taken, the prosecutor expressly advised defendant he would be deported as a consequence of his plea. She stated, "If you are not a citizen of the United States, because of your plea today you will be deported, excluded from admission to the United States, and denied naturalization." Defendant's plea was then paused so he could discuss the immigration consequences with defense counsel and he confirmed

11

he had that discussion. The trial court asked defense counsel if he discussed with defendant the immigration consequences of his plea and defense counsel responded he had.

In defendant's declaration, he stated that when his plea was paused so he could discuss with defense counsel the immigration consequences of his plea, defense counsel "told [him] nothing more and nothing different than what the [prosecutor] read in the script." That is—based on the prosecutor's advisement—that he would be deported.

At the hearing on defendant's motion to vacate his sentence, defense counsel testified immigration was a big issue in the case and he spoke with defendant about it numerous times. He testified he told defendant he would be deported if he pleaded to the charge in the plea agreement and if he went to prison. The trial court, which observed counsel's testimony found counsel to be credible.

Defendant's testimony at the hearing was conflicting. At the outset, he testified defense counsel discussed immigration consequences with him prior to the day he entered his plea. He said defense counsel told him he would be deported. Later he testified defense counsel "never mentioned anything about immigration consequences." In defense counsel's nearly year-long representation of defendant, defense counsel never mentioned anything about immigration to defendant.

Based on our independent review of the record, and considering the totality of the evidence (including credibility determinations made by the trial court after hearing live testimony), we hold defendant has not shown by a preponderance of the evidence that he did not meaningfully understand the immigration consequences of his plea at the time he pleaded no

12

contest.  Because we conclude defendant has failed to meet his burden of demonstrating he did not meaningfully understand the immigration consequences of his plea, we need not decide the merits of his argument regarding prejudice.

## IV.   DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

We concur:

HOFFSTADT, P. J.

BAKER, J.